545 F.2d 320
 9 ERC 1425, 7 Envtl. L. Rep. 20,004
 NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs-Appellees,
v.
Russell TRAIN, as Administrator of the U.S. Environmental
Protection Agency, and the U.S. Environmental
Protection Agency, Defendants-Appellants.
 No. 146, Docket 76-6075.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 16, 1976.
Decided Nov. 10, 1976.
 
 Michael H. Dolinger, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty. for the S.D.N.Y, Mary C. Daly, Asst. U.S. Atty., New York City, and Merideth Wright, Atty., E.P.A., of counsel), for appellants.
 David Schoenbrod, Roger Beers (Natural Resources Defense Council, Inc.), New York City, of counsel, for appellees.
 Before SMITH, OAKES and MESKILL, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 The Environmental Protection Agency, ("EPA"), and its Administrator, Russell Train, appeal from an order of the United States District Court for the Southern District of New York, Charles E. Stewart, Jr., Judge, in an action under § 304 of the Clean Air Act, as amended, 42 U.S.C. § 1857h-2(a), requiring the Administrator of the EPA, within thirty days, to place lead on a list of air pollutants under § 108(a)(1) of the Clean Air Act, as amended, 42 U.S.C. § 1857c-3(a)(1), ("the Act").[1] We affirm the order of the district court.
 
 
 2
 The 1970 Clean Air Act Amendments provide two different approaches for controlling pollutants in the air. One approach, incorporated in §§ 108-110, 42 U.S.C. §§ 1857c-3 to c-5, provides for the publication of a list of pollutants adverse to public health or welfare, derived from "numerous or diverse" sources, the promulgation of national ambient air quality standards for listed pollutants,[2] and subsequent implementation of these standards by the states. The second approach of the Act provides for control of certain pollutants at the source, pursuant to §§ 111, 112, 202, 211 and 231 (42 U.S.C. §§ 1857c-6, c-7, f-1, f-6c, f-9).[3]
 
 
 3
 The relevant part of § 108 reads as follows:
 
 
 4
 (a)(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant
 
 
 5
 (A) which in his judgment has an adverse effect on public health or welfare;
 
 
 6
 (B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and
 
 
 7
 (C) for which air quality criteria had not been issued before December 31, 1970, but for which he plans to issue air quality criteria under this section.
 
 
 8
 Once a pollutant has been listed under § 108(a)(1), §§ 109 and 110 of the Act are automatically invoked.[4] These sections require that for any pollutant for which air quality criteria are issued under § 108(a)(1)(C) after the date of enactment of the Clean Air Amendments of 1970, the Administrator must simultaneously issue air quality standards. Within nine months of the promulgation of such standards, states are required to submit implementation plans to the Administrator. § 110(a)(1). The Administrator must approve or disapprove a state plan within four months. § 110(a)(2). If a state fails to submit an acceptable plan, the Administrator is required to prepare and publish such a plan himself. § 110(c). State implementation plans must provide for the attainment of primary ambient air quality standards no later than three years from the date of approval of a plan. § 110(a)(2)(A)(i). Extension of the three-year period for attaining the primary standard may be granted by the Administrator only in very limited circumstances, and in no case for more than two years. § 110(e).[5]
 
 
 9
 The EPA concedes that lead meets the conditions of §§ 108(a)(1)(A) and (B) that it has an adverse effect on public health and welfare, and that the presence of lead in the ambient air results from numerous or diverse mobile or stationary sources. The EPA maintains, however, that under § 108(a)(1)(C) of the Act, the Administrator retains discretion whether to list a pollutant, even though the pollutant meets the criteria of §§ 108(a)(1)(A) and (B). The EPA regards the listing of lead under § 108(a)(1) and the issuance of ambient air quality standards as one of numerous alternative control strategies for lead available to it. Listing of substances is mandatory, the EPA argues, only for those pollutants for which the Administrator "plans to issue air quality criteria." He may, it is contended, choose not to issue, i. e., not "plan to issue" such criteria, and decide to control lead solely by regulating emission at the source, regardless of the total concentration of lead in the ambient air. The Administrator argues that if he chooses to control lead (or other pollutants) under § 211, he is not required to list the pollutant under § 108(a)(1) or to set air quality standards.
 
 
 10
 The EPA advances three reasons for the position that the Administrator has discretion whether to list a pollutant even when the conditions of § 108(a)(1) (A) and (B) have been met: the plain meaning of § 108(a)(1)(C); the structure of the Clean Air Act as a whole; and the legislative history of the Act.
 
 
 11
 The issue is one of statutory construction. We agree with the district court and with appellees, National Resources Defense Council, Inc., et al., that the interpretation of the Clean Air Act advanced by the EPA is contrary to the structure of the Act as a whole, and that if accepted, it would vitiate the public policy underlying the enactment of the 1970 Amendments as set forth in the Act and in its legislative history. Recent court decisions are in accord, and have construed § 108(a)(1) to be mandatory if the criteria of subsections A and B are met.[6]
 
 
 12
 * Section 108(a)(1) and the Structure of the Clean Air Act
 
 
 13
 Section 108(a)(1) contains mandatory language. It provides that "the Administrator shall . . . publish . . . a list . . . ." (Emphasis added.) If the EPA interpretation were accepted and listing were mandatory only for substances "for which (the Administrator) plans to issue air quality criteria . . . ", then the mandatory language of § 108(a)(1)(A) would become mere surplusage. The determination to list a pollutant and to issue air quality criteria would remain discretionary with the Administrator, and the rigid deadlines of § 108(a)(2), § 109, and § 110 for attaining air quality standards could be bypassed by him at will. If Congress had enacted § 211 as an alternative to, rather than as a supplement to, §§ 108-110, then one would expect a similar fixed timetable for implementation of the fuel control section. The absence of such a timetable for the enforcement of § 211 lends support to the view that fuel controls were intended by Congress as a means for attaining primary air quality standards rather than as an alternative to the promulgation of such standards.[7]
 
 
 14
 The EPA Administrator himself initially interpreted § 108(a)(1) as requiring inclusion on the initial list to be issued of those pollutants for which air quality criteria had not been issued but which he had already found in his judgment to have an adverse effect on public health or welfare and to come from sources specified in § 108(a)(1)(B). 36 Fed.Reg. 1515 (1971).
 
 
 15
 We agree with Judge Stewart that it is to the initial list alone that the phrase "but for which he plans to issue air quality criteria" is directed, and that the Administrator must list those pollutants which he has determined meet the two requisites set forth in section 108.
 
 II
 Legislative History
 
 16
 When a specific provision of a total statutory scheme may be construed to be in conflict with the congressional purpose expressed in an act, it becomes necessary to examine the act's legislative history to determine whether the specific provision is reconcilable with the intent of Congress.[8] Because state planning and implementation under the Air Quality Act of 1967 had made little progress by 1970, Congress reacted by "taking a stick to the States in the form of the Clean Air Amendments of 1970 . . . ." Train v. Natural Resources Defense Council, 421 U.S. 60, 64, 95 S.Ct. 1470, 1474, 43 L.Ed.2d 731 (1975). It enacted § 108(a)(1) which provides that the Administrator of the Environmental Protection Agency "shall" publish a list which includes each air pollutant which is harmful to health and originates from specified sources. Once a pollutant is listed under § 108(a)(1), §§ 109 and 110 are to be automatically invoked, and promulgation of national air quality standards and implementation thereof by the states within a limited, fixed time schedule becomes mandatory.
 
 
 17
 The EPA contention that the language of § 108(a)(1)(C) "for which (the Administrator) plans to issue air quality criteria" is a separate and third criterion to be met before § 108 requires listing lead and issuing air quality standards, thereby leaving the decision to list lead within the discretion of the Administrator, finds no support in the legislative history of the 1970 Amendments to the Act. The summary of the provisions of the conference agreement furnished the Senate by Senator Muskie contain the following language:The agreement requires issuance of remaining air quality criteria for major pollutants within 13 months of date of enactment.
 
 
 18
 and
 
 
 19
 Within the 13-month deadline, the Congress expects criteria to be issued for nitrogen oxides, fluorides, lead, polynuclear organic matter, and odors, though others may be necessary.[9]
 
 
 20
 The section-by-section analysis of the National Air Standards Act of 1970 in the Senate Report on S. 4358, 91st Cong., 2d Sess., contains this language describing § 108 (formerly designated § 109):
 
 
 21
 This new section directs the Secretary to publish (initially 30 days after enactment) a list of air pollution agents or combination thereof for which air quality criteria will be issued. He can add to the list periodically. The agents on the initial list must include all those pollution agents or combinations of agents which have, or can be expected to have, an adverse effect on health and welfare and which are emitted from widely distributed mobile and stationary sources, and all those for which air quality criteria are planned.
 
 
 22
 Twelve months after such initial list is published, the Secretary must issue air quality criteria for those listed agents.
 
 
 23
 The Secretary must also issue information on air pollution control techniques.
 
 
 24
 This section continues in effect those air quality criteria and information on pollution control techniques published prior to this section.
 
 
 25
 This section provides that such criteria and information shall be published in the Federal Register and be available to the public.[10]
 
 
 26
 The same Senate Report contains the following explicit language regarding §§ 108 and 109 (formerly § 109 and § 110):
 
 
 27
 Air quality criteria for five pollution agents have already been issued (sulfur oxides, particulates, carbon monoxide, hydrocarbons, and photochemical oxidants). Other contaminants of broad national impact include fluorides, nitrogen oxides, polynuclear organic matter, lead, and odors. Others may be added to this group as knowledge increases. The bill would require that air quality criteria for these and other pollutants be issued within 13 months from enactment. If the (Secretary) subsequently should find that there are other pollution agents for which the ambient air quality standards procedure is appropriate, he could list those agents in the Federal Register, and repeat the criteria process.
 
 
 28
 Within 30 days after enactment the (Secretary) would be required to publish proposed national air quality standards for those pollutants covered by existing air quality criteria (sulfur oxides, particulate matter, carbon monoxide, hydrocarbons, and photochemical oxidants). Since these criteria have been available for some time, it is realistic to expect that proposed national standards for these five pollution agents would be published within the 30-day period. Proposed national air quality standards for pollutants for which criteria would be issued subsequent to enactment would be published simultaneously with the issuance of such criteria. These pollutants would include nitrogen oxides, lead, polynuclear organics, odors, and fluorides.[11]
 
 
 29
 (Emphases added.)
 
 
 30
 Language relating to the issuance of new source performance standards makes it clear that the Senate intended these standards to be supplementary to, not in lieu of, ambient air quality standards:
 
 
 31
 The committee recognizes that the construction of major new industrial facilities in some regions may conflict with implementation plans for national air quality standards and goals even where such new facilities are designed, equipped, and operated so as to comply with applicable Federal standards of performance. This is most likely to occur in places where existing levels of air pollution are excessive. Accordingly, the bill would provide that new-source certification procedures must include preconstruction review of the location as well as the design of affected new facilities so that certified new sources would not hinder the implementation of air quality standards and goals.[12]
 
 
 32
 While the literal language of § 108(a)(1)(C) is somewhat ambiguous, this ambiguity is resolved when this section is placed in the context of the Act as a whole and in its legislative history. The deliberate inclusion of a specific timetable for the attainment of ambient air quality standards incorporated by Congress in §§ 108-110 would become an exercise in futility if the Administrator could avoid listing pollutants simply by choosing not to issue air quality criteria. The discretion given to the Administrator under the Act pertains to the review of state implementation plans under § 110, and to § 211 which authorizes but does not mandate the regulation of fuel or fuel additives. It does not extend to the issuance of air quality standards for substances derived from specified sources which the Administrator had already adjudged injurious to health.[13]
 
 III
 Judicial Interpretations
 
 33
 The Supreme Court in Union Electric Co. v. Environmental Protection Agency, 427 U.S. 246, 256, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976), referred to the 1970 Amendments of the Clean Air Act as "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution." In the same opinion the Court described the three-year deadline for achieving primary air quality standards as "central to the Amendments' regulatory scheme." Id. at 258, 96 S.Ct. at 2526.[14] Previously the Court had referred to the attainment of the national air quality standards within three years from the date of approval of state implementation plans as "the heart of the 1970 Amendments." Train v. Natural Resources Defense Council, 421 U.S. 60, 66, 95 S.Ct. 1470, 1475, 43 L.Ed.2d 731 (1975). The EPA, the Court stated, "is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met." Id. at 79, 95 S.Ct. at 1481. Reference by the Court to EPA authority to regulate emissions at the source, under §§ 111, 202, 211, and 231, is restricted to a footnote. Id. at 79, n. 16, 95 S.Ct. 1470.
 
 
 34
 The Court's language in Train and Union Electric lends no support to appellants' position that the EPA Administrator may order emission source controls instead of promulgating ambient air quality standards for substances, such as lead, which meet the criteria of §§ 108(a)(1)(A) and (B). Under the scheme of the Act, emission source control is a supplement to air quality standards, not an alternative to them.
 
 
 35
 When "interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute . . . and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature. . . ."
 
 
 36
 Chief Justice Burger, in Kokoszka v. Belford, 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974), reh. denied, 419 U.S. 886, 95 S.Ct. 160, 42 L.Ed.2d 131 (1974) (citation omitted).
 
 
 37
 The structure of the Clean Air Act as amended in 1970, its legislative history, and the judicial gloss placed upon the Act leave no room for an interpretation which makes the issuance of air quality standards for lead under § 108 discretionary. The Congress sought to eliminate, not perpetuate, opportunity for administrative foot-dragging. Once the conditions of §§ 108(a) (1)(A) and (B) have been met, the listing of lead and the issuance of air quality standards for lead become mandatory.
 
 
 38
 The order of the district court is affirmed.
 
 
 
 [1]
 In compliance with the court order, the Administrator listed lead under § 108(a)(1) on March 31, 1976, 41 Fed.Reg. 14921 (1976), with the proviso that the listing would be withdrawn if the decision of the district court is reversed on appeal
 
 
 [2]
 40 C.F.R. § 50.1(e) defines ambient air as "that portion of the atmosphere, external to buildings, to which the general public has access."
 
 
 [3]
 Section 111 pertains to emission performance standards for new stationary sources; § 112 requires regulation of emissions of air pollutants found hazardous to health; § 202 requires emission standards for new automobiles; § 211 authorizes the Administrator to regulate the manufacture and sale of fuel or fuel additives; § 231 provides for regulation of aircraft emissions
 
 
 [4]
 Section 109, 42 U.S.C. § 1857c-4 provides in relevant part:
 SEC. 109. (a)(1) The Administrator
 (A) within 30 days after the date of enactment of the Clean Air Amendments of 1970, shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued prior to such date of enactment; and
 (B) after a reasonable time for interested persons to submit written comments thereon (but no later than 90 days after the initial publication of such proposed standards) shall by regulation promulgate such proposed national primary and secondary ambient air quality standards with such modifications as he deems appropriate.
 (2) With respect to any air pollutant for which air quality criteria are issued after the date of enactment of the Clean Air Amendments of 1970, the Administrator shall publish, simultaneously with the issuance of such criteria and information, proposed national primary and secondary ambient air quality standards for any such pollutant. The procedure provided for in paragraph (1) (B) of this subsection shall apply to the promulgation of such standards.
 (b)(1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which in the judgment of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health. Such primary standards may be revised in the same manner as promulgated.
 Section 110, 42 U.S.C. § 1857c-5, provides in pertinent part:
 SEC. 110. (a)(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within nine months after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 109 for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within nine months after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.
 (2) The Administrator shall, within four months after the date required for submission of a plan under paragraph (1), approve or disapprove such plan or each portion thereof. The Administrator shall approve such plan, or any portion thereof, if he determines that it was adopted after reasonable notice and hearing and that
 (A)(i) in the case of a plan implementing a national primary ambient air quality standard, it provides for the attainment of such primary standard as expeditiously as practicable but (subject to subsection (e)) in no case later than three years from the date of approval of such plan (or any revision thereof to take account of a revised primary standard); and (ii) in the case of a plan implementing a national secondary ambient air quality standard, it specifies a reasonable time at which such secondary standard will be attained;
 (c) The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if
 (1) the State fails to submit an implementation plan for any national ambient air quality primary or secondary standard within the time prescribed,
 (2) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section, or
 (3) the State fails within 60 days after notification by the Administrator or such longer period as he may prescribe, to revise an implementation plan as required pursuant to a provision of its plan referred to in subsection (a)(2) (H).
 (e)(1) Upon application of a Governor of a State at the time of submission of any plan implementing a national ambient air quality primary standard, the Administrator may (subject to paragraph (2)) extend the three-year period referred to in subsection (a)(2)(A)(i) for not more than two years for an air quality control region if after review of such plan the Administrator determines that
 
 
 [5]
 It is irrelevant that the current state of scientific knowledge may make it difficult to set an ambient air quality standard. The Administrator must proceed in spite of such difficulties:
 The Committee is aware that there are many gaps in the available scientific knowledge of the welfare and other environmental effects of air pollution. . . . A great deal of basic research will be needed to determine the long-term air quality goals which are required to protect the public health and welfare from any potential effects of air pollution. In the meantime, the Secretary will be expected to establish such national goals on the basis of the best information available to him.
 (emphasis added). S.Rep. No. 91-1196 on S. 4358. National Air Quality Standards Act of 1970, "Report of the Committee on Public Works, United States Senate," 91st Cong., 2d Sess. at 11; A Legislative History of the Clean Air Amendments of 1970, Vol. I. at 411 (1974) (hereafter Legislative History, Clean Air Amendments ).
 
 
 [6]
 Promulgation of standards for pollutants meeting § 108(a)(1)(A) and (B) criteria has been viewed as mandatory in dicta by the following courts: Indiana & Michigan Electric Co. v. EPA, 509 F.2d 839, 841 (7th Cir. 1975); Kennecott Copper Corp. v. EPA, 149 U.S.App.D.C. 231, 462 F.2d 846, 857 (1972); but cf. St. Joe Minerals Corp. v. EPA, 508 F.2d 743, 744 n. 3 (3d Cir. 1975), vacated as moot, --- U.S. ----, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976)
 
 
 [7]
 Section 211, 42 U.S.C. § 1857f-6c provides in relevant part:
 SEC. 211. (a) The Administrator may by regulation designate any fuel or fuel additive and, after such date or dates as may be prescribed by him, no manufacturer or processor of any such fuel or additive may sell, offer for sale, or introduce into commerce such fuel or additive unless the Administrator has registered such fuel or additive in accordance with subsection (b) of this section.
 
 
 [8]
 See Federal Trade Comm'n v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968):
 (W)e cannot, in the absence of an unmistakable directive, construe the Act in a manner which runs counter to the broad goal which Congress intended it to effectuate.
 
 
 [9]
 Legislative History, Clean Air Amendments, Vol. 1 at 430, 432
 
 
 [10]
 Legislative History, Clean Air Amendments, Vol. 1 at 454
 
 
 [11]
 Legislative History, Clean Air Amendments, Vol. 1 at 409, 410
 
 
 [12]
 Legislative History, Clean Air Amendments, Vol. 1 at 417
 
 
 [13]
 South Terminal Corp. v. EPA, 504 F.2d 646, 654 (1st Cir. 1974), cited in the brief by Train, refers to the discretion of the Administrator in approving state implementation plans. It does not address itself to the issuance of air quality standards
 
 
 [14]
 The following language appears in Union Electric Co. v. EPA, 427 U.S. 246, 258, 96 S.Ct. 2518, 2526, 49 L.Ed.2d 474 (1976):
 Section 110(a)(2)(A)'s three-year deadline for achieving primary air quality standards is central to the Amendments' regulatory scheme and, as both the language and the legislative history of the requirement make clear, it leaves no room for claims of technological or economic infeasibility.