NATURAL RESOURCES DEFENSE
COUNCIL, INC., Plaintiff,

v.

Lee M. THOMAS, Administrator, United
States Environmental Protection
Agency, Defendant,

and

The Acrylonitrile Group, Inc., Alabama
Power Company, et al., American Mining Congress, Association of Ethylene
Oxide Users, the Cadmium Council,
Inc., Chemical Manufacturers Association, the Ethylene Oxide Industry
Council, the Leather Industries of
America, the Society of the Plastics Industry, Inc., and the Specialty Steel Industry of the United States, Intervenors.

No. 86 Civ. 0603 (CSH).

United States District Court,
S.D. New York.

June 22, 1988.

Galloway & Greenberg, David D. Doniger and Eric Goldstein, Washington, D.C., for plaintiff; Eldon V.C. Greenberg, of counsel.

U.S.E.P.A., Michael W. Steinberg, John A. Amodeo, Stephen Samuels and Charles S. Carter, Washington, D.C., for defendant; Earl Salo, of counsel.

Hunton & Williams, David R. Marshall, New York City, Hunton & Williams, Henry V. Nickel, F. William Brownell and Norman W. Fichthorn, Washington, D.C., for Acrylonitrile Group, Inc. and Alabama Power Co.

Locker, Greenberg & Brainin, Aaron Locker, New York City, Hamel & Park, Anthony J. Thompson, John G. DeGooyer, Charles E. Sliter and William J. Hamel, Washington, D.C., for American Mining Congress and Cadmium Council, Inc.

Cleary, Gottlieb Steen & Hamilton, George Weisz, Cleary, Gottlieb, Steen & Hamilton, New York City, Robert C. Barnard and Sara D. Schotland, Washington, D.C., for American Paper Institute and The Ethylene Oxide Industry Council.

Shereff, Friedman, Hoffman & Goodman, Jerome Marshak, New York City, Kirkland & Ellis, Arthur F. Sampson, III, American Petroleum Institute, Stark Ritchie, Martha Beauchamp and Valerie J. Ughetta, Washington, D.C., for American Petroleum Institute.

Epstein Becker Borsody & Green, P.C., Dennis A. Lalli, New York City, Epstein Becker Borsody & Green, P.C., David H. Larry, Washington, D.C., for Ass'n of Ethylene Oxide Users.

Cravath, Swain & Moore, Ronald S. Rolfe, New York City, Wilmer, Cutler & Pickering, Neil J. King and A. Stephen Hut, Jr., Chemical Mfrs. Ass'n, David F. Zoll and Donald D. Evans, Washington, D.C., for Chemical Mfrs. Ass'n.

Shea & Gould, Daniel L. Carroll, New York City, Keller & Heckman, Jerome H. Heckman, Peter L. de la Cruz and Susan T. Conti, Washington, D.C., for Soc. of the Plastics Industry, Inc.

Roth & Korn, Henry Korn, New York City, Coller, Shannon, Rill & Scott, Richard E. Schwartz and John L. Wittenborn, Washington, D.C., for Leather Industries of America and Specialty Steel Industry of the U.S.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Natural Resources Defense Council, Inc. ("NRDC") brings suit pursuant to § 304[1] of the Clean Air Act ("Act"),[2] the so-called "citizen suit" provision of the Act, to compel the Administrator of the United States Environmental Protection Agency ("EPA" or "Agency") to add two metals (cadmium and hexavalent chromium) and six organic chemicals (acrylonitrile, carbon tetrachloride, chloroform, ethylene oxide, 1,3–butadiene and ethylene dichloride) ("the pollutants") to the list of hazardous air pollutants that the EPA is charged with maintaining under § 112(b)(1)(A)[3] of the Act. The chemicals and metals involved are used in a vast variety of industrial processes including, in small part, the manufacture of other industrial chemicals, plastics, synthetic fibers and rubber, stainless steel, paints, gasoline, pharmaceutical, as well as for grain fumigants, refrigerants, and for treating wastewater. NRDC argues that the pollutants must be added to the list of hazardous air pollutants because each has been tentatively classified as either a known or probable carcinogen by the EPA.

Plaintiff moved for summary judgment. Defendant and industry intervenors moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), alleging lack of subject matter jurisdiction, and cross-moved for summary judgment.[4] Oral argument on the motions was held on March 11, 1988. ("Tr."). Because this court lacks subject matter jurisdiction over the dispute, I grant defendant's and intervenors' motions to dismiss.

## BACKGROUND

### The Statutory Scheme

At issue in the present action is the EPA's duties under § 112 of the Clean Air Act.[5] Section 112 is the Act's mechanism for regulating pollutants in ambient air that are emitted from stationary sources. Other sections of the Act authorize regulation of emissions from mobile sources of pollution such as automobiles.

Section 112 places on the Administrator of the EPA a twofold obligation. In the first instance, § 112(b)(1)(A) of the Act requires that the Administrator maintain a list of "hazardous air pollutants." According to the statute:

The Administrator shall, within 90 days after December 31, 1970, publish (and shall from time to time thereafter revise) a list which includes each hazardous air pollutant for which he intends to issue an emission standard under this section.

42 U.S.C. § 7412(b)(1)(A). Section 112 does not specify how frequently the EPA must revise the initial list of hazardous air pollutants. A "hazardous air pollutant" is defined in § 112(a)(1) as

an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness.

42 U.S.C. § 7412(a)(1). The language of the statute does not specify the mechanism

---

1. 42 U.S.C. § 7604 (1983).

2. 42 U.S.C. § 7401 et seq. (1983).

3. 42 U.S.C. § 7412(b)(1)(A) (1983).

4. The EPA also moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), alleging that the complaint failed to state a claim upon which relief can be granted.

5. 42 U.S.C. § 7412 (1983).

by which the Administrator is to determine whether a pollutant is a "hazardous air pollutant," nor does it require that the Administrator make a formal "finding" of hazardousness.

Once a pollutant has been added to the list of hazardous air pollutants, § 112(b)(1)(B) of the Act imposes on the Administrator a second obligation, the duty to promulgate regulations aimed at controlling emissions of the pollutant.[6] Proposed regulations must be published within 180 days of the date a pollutant is listed pursuant to § 112(b)(1)(A) and 180 days thereafter final emission standards must be published, unless as a result of public hearings the Administrator determines that the pollutant "clearly is not a hazardous air pollutant." Emission standards are to be set at a level which in the Administrator's judgment will protect the public health with an "ample margin of safety." As is readily apparent by the terms of the statute, the regulatory timetables of the Act are not engaged until after a substance is listed under § 112(b)(1)(A). Plaintiff, by its current action, seeks to trigger those deadlines by first causing the EPA to list the pollutants that are the subject of this action.

*Regulatory History*

On October 10, 1979 the EPA published a notice soliciting comments on proposed rules intended to govern the "policies and procedures to be used by [EPA] in the identification, assessment and regulation under the Clean Air Act of substances which, when emitted into the ambient air for [sic] stationary sources, increase the risk of cancer to the general population."[7]

The policies put forth by the EPA were intended to apply to EPA decision making under § 112. Although they were never finally adopted by the Administrator, the proposed rules have greatly influenced EPA interpretation of § 112. Memorandum in Support of Defendant's Motion to Dismiss at 8.

One of the principles adopted by the EPA in the proposed cancer policy was the understanding that no threshold of exposure could be determined below which any carcinogen could be assumed to pose no risk whatsoever to exposed persons.[8] Although the EPA adopted the view that exposure to carcinogens would always pose some risk to the general population, it rejected the idea that § 112 required "the total elimination of risks from such substances."[9] The rules thus expressed the EPA's intent to list as hazardous air pollutants only those carcinogenic substances that "present significant carcinogenic risks to the public...."[10]

The EPA first set emission standards for air pollutants under § 112 shortly after the Act's enactment in 1970. To date, the EPA has listed or issued final regulations for approximately eight or nine pollutants and has made final decisions not to regulate approximately one dozen others. Tr. at 52. Overall, it can be safely said that the EPA has not rushed to regulate air pollutants under § 112. In a hearing held in 1983 by the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, the former administrator of the EPA, William D. Ruckelshaus, admitted "that delays in implementing Section 112 have been substantial and, to a

---

**6.** This section, 42 U.S.C. § 7412(b)(1)(B), provides:

> (B) Within 180 days after the inclusion of any air pollutant in such list, the Administrator shall publish proposed regulations establishing emission standards for such pollutant together with a notice of a public hearing within thirty days. Not later than 180 days after such publication, the Administrator shall prescribe an emission standard for such pollutant, unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous air pollutant. The Administrator shall establish any such standard at the level which in his judg-

ment provides an ample margin of safety to protect the public health from such hazardous air pollutant.

**7.** Proposed Rulemaking, Policy and Procedures for Identifying, Assessing and Regulating Airborne Substances Posing a Risk of Cancer, 44 Fed.Reg. 58,642 (October 10, 1979).

**8.** *Id.* at 58,645.

**9.** *Id.* at 58,652.

**10.** *Id.* at 58,647.

large extent, avoidable." [11] Ruckelshaus promised the subcommittee that the EPA would "complete, by the end of 1985, decisions for approximately 20–25 substances on the list of 37" that the EPA had identified as possible candidates for listing.[12] Seven of the eight pollutants at issue (all but 1,3–butadiene) were first identified by the EPA as possible candidates for listing as hazardous air pollutants in the late 1970s and early 1980s. Yet to date none of the eight pollutants has been listed by the EPA.

Perhaps as a result of the promise made by former Administrator Ruckelshaus, between June and October 1985 the EPA published in the Federal Register a series of notices relating to the eight substances that are the subject of the current action.[13] Each notice is approximately four to five pages long and follows a similar format. After a short summary of the contents of the document and description of uses of the chemical or metal, the notices typically describe (a) the usual sources and amounts of pollutant emitted each year, (b) the extent of public exposure to the pollutant, (c) the potential negative health effects based on exposure to any amount of the pollutants by any method, (d) the risk to public health from polluted ambient air, (e) a statement of the EPA's intent with regard to regulation of the pollutant, and (f) a final description of the EPA rulemaking process and request for further information from the public.

EPA conclusions expressed in the notices that related to health effects and risks relied on findings contained in either a Health Assessment Document ("HAD") or Mutagenicity and Carcinogenicity Assessment Document ("MCAD"), both reports issued by the agency comprehensively evaluating the health effects of each pollutant. The HAD or MCAD in each case was submitted to and reviewed by the EPA's Science Advisory Board ("SAB") for advice concerning the agency's health-related findings. Besides summarizing the EPA's findings with regard to the pollutants' toxicity and other health effects, the notices contain the EPA's conclusion that seven of the eight pollutants should be considered probable human carcinogens based on the evidence collected. With regard to the eighth pollutant, hexavalent chromium, the EPA concluded that scientific evidence supported classifying that substance as a known human carcinogen.

Despite the probable or known carcinogenic effects of the pollutants, all eight notices expressly said that the EPA had decided not to list the relevant pollutant pursuant to § 112 at that time. Instead, seven of the notices expressed the EPA's intent to list the subject pollutant at an unspecified time in the future. Those notices used virtually identical language to explain the EPA's intentions. The notice for cadmium is typical:

> Based on the health and preliminary risk assessment described in today's notice, EPA now intends to add cadmium to the section 112(b)(1)(A) list. The EPA will decide whether to add cadmium to the list only after studying possible techniques that might be used to control emissions of cadmium compounds and after further improving the assessment of the public health risks. The EPA will

**11.** Plaintiff's Memorandum in Support of Motion for Summary Judgment at 6, quoting *Hearing on EPA's Air Pollution Control Program before the Subcommittee on oversight and Investigations of the House Committee on Energy and Commerce,* 98th Cong., 1st Sess. 26–30 (Nov. 7, 1983).

**12.** *Id.* at 7.

**13.**
a) *Chromium*—50 Fed.Reg. 24,317 (June 10, 1985);
b) *Acrylonitrile*—50 Fed.Reg. 24,319 (June 10, 1985);
c) *Carbon Tetrachloride*—50 Fed.Reg. 32,621 (Aug. 10, 1985);
d) *Chloroform*—50 Fed.Reg. 39,626 (Sept. 27, 1985);
e) *Ethylene Oxide*—50 Fed.Reg. 40,286 (Oct. 2, 1985);
f) *1,3–Butadiene*—50 Fed.Reg. 41,466 (Oct. 10, 1985);
g) *Cadmium*—50 Fed.Reg. 42,000 (Oct. 16, 1985);
h) *Ethylene Dichloride*—50 Fed.Reg. 41,994 (Oct. 16, 1985).

add cadmium to the list if emission standards are warranted. The EPA will publish this decision in the Federal Register. 50 Fed.Reg. at 42,003. According to defendant, by publishing the notices the EPA hoped to advise the public of the current status of ongoing administrative proceedings and to solicit further public participation in the decisionmaking process. Defendant's Reply Memorandum at 9–10.

Acrylonitrile is the only pollutant for which the EPA varied from the above pattern. Instead of expressing its intent to list acrylonitrile under § 112, the EPA's notice announced the beginning of a "pilot program" under which state and local agencies with jurisdiction over individual sources of acrylonitrile emissions would assess any health effects caused by atmospheric concentrations of acrylonitrile and determine whether regulatory controls were needed for specific sources. According to the EPA, a localized approach was justified "[b]ecause the estimated national aggregate cancer risks are relatively low (i.e., one cancer incidence every two years) and because AN [acrylonitrile] emissions appear to be localized and limited." [14] Involving the states would allow "tailoring of individual regulations" and would "likely result in faster regulation of AN sources," as well as "the conservation of EPA resources." The pilot program was also intended as a valuable "test," from which lessons could be drawn for future programs. The pilot program was to begin with negotiations between the EPA and the 14 states or local air pollution control agencies with jurisdiction over the major sources of acrylonitrile emissions. Such negotiations would have as their goal the preparation of a Memorandum of Understanding (MOU) or letter of intent agreed to by the EPA and the local authority setting out such things as the methodology for further scientific research, the kind of EPA technical support to be provided, mechanisms for informing the public, and legal authority for regulations (if appropriate). If the local authority chose to participate in the pilot program, the ultimate decision whether to require controls of acrylonitrile emissions would be the responsibility of the local agency and would not be subject to approval or disapproval by the EPA, although the EPA reserved the right to negotiate certain time-limits for local decisionmaking.

Plaintiff contends that the EPA's conclusion that each of the pollutants is either a probable or known carcinogen, when coupled with the understanding that there is no no-risk threshold for carcinogens, is the "functional equivalent" of a finding by the EPA that each substance is a "hazardous air pollutant" under the statute and thus must be listed pursuant to § 112(b)(1)(A). Plaintiff's Reply Memorandum at 45. By various letters dated September 9, 1985 and October 23, 1985 plaintiff gave notice to the EPA of its intent to seek legal action that would force the EPA to list the subject pollutants. On January 21, 1986 plaintiff filed the current action.[15]

## JURISDICTION

Defendant and industry intervenors contend that this court lacks subject matter

---

**14.** The portion of the notice that explains the basis for the pilot program reads as follows:

Because the estimated national aggregate cancer risks are relatively low (i.e., one cancer incidence every two years) and because AN emissions appear to be localized and limited, a national regulatory program does not appear to be the best approach to protecting public health. In the Administrator's judgment, the limited and localized nature of AN is more efficiently addressed through State and local controls, with EPA providing technical and scientific assistance to the affected State and local air pollution control agencies. This approach allows tailoring of individual regulations to the degree of any public health problem, builds upon the unique strengths of the Federal and the State and local governments, will likely result in faster regulation of AN sources, and will result in a conservation of EPA resources. Applying this approach on a pilot basis allows EPA to test an approach for handling pollutants which relies upon State/local agencies to evaluate and, if appropriate, regulate AN-emitting sources. In addition, this approach provides for controls more related to plant-specific risks, possibly optimizing costs and benefits more than the traditional approach used by EPA.

50 Fed.Reg. at 24,320.

**15.** NRDC filed its suit more than 60 days after it gave notice of its intent to sue, as required by § 304(b)(2).

jurisdiction over the current controversy and that plaintiff's complaint must therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

Plaintiff relies primarily on § 304(a)(2) of the Clean Air Act, the so-called "citizen-suit provision," as the basis for this court's subject matter jurisdiction. Section 304(a)(2) bestows on the district courts jurisdiction to hear civil actions brought by any person "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." [16] "Congress provided for district court enforcement under section 304 in order to permit citizen enforcement of 'clear-cut violations by polluters or defaults by the Administrator' where the only required judicial role would be to make a clear-cut factual determination of whether a violation did or did not occur." [17] Congress specifically limited district court jurisdiction to the review of nondiscretionary acts or duties in order to "limit the number of citizen suits which

could be brought against the Administrator and to lessen the disruption of the Act's complex administrative process." *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1353 (9th Cir.1978).

Section 304(a)(2)'s grant of jurisdiction to the district courts is an exception to the larger plan for judicial review of Agency action under the Clean Air Act laid out by Congress in § 307(b) of the Act. [18] Section 307(b) grants to the Court of Appeals for the District of Columbia Circuit exclusive jurisdiction over "petition[s] for review of action of the Administrator in promulgating ... any emission standard or requirement under section 112 ... or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter...." Final actions of the Administrator which have only local or regional applicability are reviewed by the appropriate court of appeals. Section 307(b) thus grants to the appellate courts the power to review all final, discretionary decisions made by the Administra-

---

**16.** 42 U.S.C. 7604(a)(2) (1983).

**17.** *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C.Cir.1987).

**18.** 42 U.S.C. § 7607(b) (1983). That section provides:

   (b) Judicial review

   (1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 112 [42 U.S.C. § 7412], any standard of performance or requirement under section 111 [42 U.S.C. § 7411], any standard under section 202 [42 U.S.C. § 7521] (other than a standard required to be prescribed under section 202(b)(1) [42 U.S.C. § 7521(b)(1)]), any determination under section 202(b)(5) [42 U.S.C. § 7545], any standard under section 231 [42 U.S.C. § 7571] any rule issued under section 113, 119, or under section 120 [42 U.S.C. §§ 7413, 7419, or 7420], or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111(d) [42 U.S.C. § 7410 or 7411(d)], any order under section 111(j) [42 U.S.C. § 7411(j)], under section

112(c) [42 U.S.C. § 7412(c)], under section 113(d) [42 U.S.C. § 7413(d)], under section 119 [42 U.S.C. § 7419], or under section 120 [42 U.S.C. § 7420], or his action under section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977) or under regulations thereunder, or any final action of the Administrator under title I [42 U.S.C. §§ 7401 et seq.]) which is locally or regionally applicable may be filed only in the United States Courts of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date of notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise.

   (2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement.

tor. By contrast, this Court has jurisdiction to adjudicate the present controversy only if it involves a non-discretionary duty of the Administrator made reviewable by § 304(a)(2).

*Administrator's Non-discretionary Duty Under § 112(b)(1)(A)*

There can be no dispute that the plain language of § 112(b)(1)(A) imposes on the EPA a mandatory, non-discretionary duty to list any substance found by the Agency to be a hazardous air pollutant. That section provides that the Administrator *"shall ... publish ... a list which* includes each hazardous air pollutant for which he intends to establish an emission standard under this section" (emphasis added). " 'Shall' ... is the language of command." *Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935).

The Second Circuit's decision in the analogous case of *Natural Resources Defense Council, Inc. v. Train,* 545 F.2d 320 (2d Cir.1976) is sound authority for the mandatory nature of § 112(b)(1)(A)'s duty to list. In *NRDC v. Train* the plaintiff sought to force the EPA to regulate the metal lead by means of § 108(a)(1) of the Clean Air Act,[19] which provides that "the Administrator shall ... publish, and shall from time to time thereafter revise, a list" of pollutants from certain sources that in the Administrator's "judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." Of this portion of § 108, which virtually mirrors the relevant language of § 112, the district court said:

> While the Administrator is provided with much discretion to make the threshold determination of whether a pollutant has "an adverse effect on health," after that decision is made, and after it is determined that a pollutant comes from the necessary sources, there is no discretion provided by the statute not to list the pollutant. We think that Congress intended to trigger the elaborate procedures of §§ 108–110 whenever the above two factors were found to exist.

*NRDC v. Train,* 411 F.Supp. 864, 868 (S.D. N.Y.), *aff'd,* 545 F.2d 320 (2d Cir.1976). The district court's interpretation of § 108, which was specifically endorsed by the court of appeals, 545 F.2d at 325, applies equally well to § 112.

The EPA advances the position that even if the Administrator finds a pollutant to be a "hazardous air pollutant" under the terms of § 112(a)(1), the choice of whether to list under § 112(b)(1)(A) is discretionary with the Administrator because by the terms of that subsection the Administrator must only list those hazardous pollutants "for which he intends to establish an emission standard under this section." Defendant maintains that that language was intended by Congress to give the Administrator the discretion to choose sections of the Act other than § 112 by which to regulate hazardous air pollutants.

The defendant's argument is the same one it put forth with respect to § 108(a)(1) in *NRDC v. Train.* Section 108(a)(1) requires that the Administrator list pollutants emitted from certain sources that may reasonably be anticipated to endanger public health and welfare and for which "he [the Administrator] plans to issue air quality criteria under this section." Just as the "plans" language and structure of § 108 is analogous to the "intends" language and structure of § 112, the reasoning that the court of appeals used to reject the EPA's position in *NRDC v. Train* is equally applicable to the case at bar. The court said:

> If the EPA interpretation were accepted and listing were mandatory only for substances "for which [the Administrator] plans to issue air quality criteria ...", then the mandatory language of § 108(a)(1)(A) would become mere surplusage. The determination to list a pollutant and to issue air quality criteria would remain discretionary with the Administrator, and the rigid deadlines of § 108(a)(2), § 109, and § 110 for attaining air quality standards could be bypassed by him at will.

---

**19.**  42 U.S.C. § 7408(a)(1).

545 F.2d at 320. Section 112(b)(1)(A) does not give to the Administrator discretion to choose among the remedies which the Act provides. Rather, that section requires that the Administrator must list for purposes of regulation under § 112(b)(1)(B) any substance that the Administrator determines to be a hazardous air pollutant.

*Administrator's Discretionary Power Under § 112(a)(1)*

■ By the unambiguous terms of § 112(a)(1) Congress left to the discretion of the Administrator the threshold determination of which substances are hazardous air pollutants. According to the statute, a hazardous air pollutant is one which *"in the judgment of the Administrator* causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. § 7412(a)(1) (emphasis added). The answer to whether the Administrator has failed to perform a non-discretionary duty to list thus turns on the threshold determination of whether the Administrator has already identified the substance as a hazardous air pollutant by exercise of his discretionary powers.

Plaintiff contends that the notices published in 1985 which revealed the EPA's preliminary conclusion that the subject pollutants were either probable carcinogens or in one case a known carcinogen, and which expressed the EPA's intention to eventually list seven of the subject pollutants and to create the pilot program for acrylonitrile, amounted to the "functional equivalent" of a finding by the Administrator that the substances involved are hazardous air pollutants. Because the statute speaks only of "an increase" in the enumerated ills, plaintiff argues that the Administrator must find pollutants to be hazardous even if the "increase" in mortality or serious illness were attributable to a single person over any period of time. According to the plaintiff, the decision whether a pollutant is hazardous, and hence the decision whether

to list, must be made without regard to whether the increase is "significant." Plaintiff asks that I establish a rule that any substance found by the EPA to be either a known or probable carcinogen is, *per se,* a hazardous air pollutant for which the EPA must promulgate regulations pursuant to § 112(b)(1)(B).

■ There could be no doubt as to this court's power to compel the non-discretionary listing of the subject pollutants if there were no controversy over whether the EPA had already found them to be hazardous air pollutants. That was the situation in *NRDC v. Train, supra,* a case much relied upon by NRDC, where the court of appeals mandated listing after the Administrator conceded that, in his judgment, lead met the statutory definition of a pollutant having "an adverse effect on public health and welfare." 545 F.2d at 324. The result in *NRDC v. Train* is clearly consistent with the intent of Congress that § 304 citizen suits should enforce "clear cut" [20] non-discretionary duties.

*NRDC v. Train,* however, is easily distinguished from the case at bar. In the current controversy the EPA does not concede that the subject air pollutants meet the statute's definition of "hazardous." Quite the opposite is true. The agency resolutely maintains that it has made no final determination as to the degree of risk posed by each of the pollutants and specifically denies that it has found any of the pollutants to be hazardous air pollutants under the terms of the statute. Plaintiff asks me to substitute my own opinion of whether the pollutants are "hazardous air pollutants" for the conclusion of the Administrator that there is not presently sufficient information to make that determination. I decline to do so.

The current controversy turns in large part on the scope of the Administrator's discretion to identify hazardous air pollutants under § 112(a)(1). If the grant of discretion given to the Administrator by Congress is as narrow as the plaintiff

---

**20.** *Mountain States Legal Foundation v. Costle,* 630 F.2d 754, 766 (10th Cir.1980), *cert. denied,* 450 U.S. 1050, 101 S.Ct. 1770, 68 L.Ed.2d 246 (1981).

maintains, then the power of the district courts to compel listing may be great indeed. However, the jurisdictional issue is which court Congress intended to make such interpretations. Questions relating to the statute's definition of a hazardous air pollutant, including whether the danger posed by the pollutant must be "significant," go to the very heart of the Administrator's discretionary powers provided for under § 112(a)(1). Exclusive jurisdiction to review the final, discretionary decisions of the EPA under the Clean Air Act has been given by Congress to the appellate courts. That broad grant stands in marked contrast to the "narrowly defined" [21] and "indisputably limited" [22] grant of jurisdiction given to the district courts by § 304. I conclude that for this court to attempt to define the scope of EPA powers made plainly discretionary on the face of the statute, merely because exercise of those powers might give rise to an enforceable non-discretionary duty, would be to exceed the jurisdiction granted the district courts. Such determinations are necessarily left to the Court of Appeals for the District of Columbia Circuit, the court to which Congress has assigned review of nationally applicable discretionary actions of the Administrator. Any other conclusion would create the risk of inconsistent judgments and resulting confusion that Congress sought to avoid by vesting exclusive jurisdiction in the D.C. Circuit. *See Telecommunications Research and Action Center v. F.C.C.,* 750 F.2d 70, 78 (D.C.Cir.1984).

Interference with the Administrator's discretionary powers is particularly inappropriate in this case where, in order to determine whether the Administrator has found the subject pollutants to be the "functional equivalent" of hazardous air pollutants, I am called upon to judge the sufficiency of Agency decisions based on analyses of complex scientific data. Such decisions require "the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary." *Kennecott Copper Corp. v. Costle,* 572 F.2d 1349, 1354 (9th Cir.1978). To the extent that I must determine the validity of EPA decisions based on complex "linearized multistage extrapolation model[s]" [23] or the "Hanna–Gifford algorithm for estimating exposure from area source emissions," [24] I have likely exceeded § 304's limited grant of jurisdiction over the "clear-cut" non-discretionary duties of the Administrator. In addition, to hold that an agency has made a final, binding determination when it publishes conclusions clearly described as "preliminary," would chill the dissemination of tentative information by government regulators and limit opportunities for public participation in the decisionmaking process. Such opportunities for public input are particularly valuable and worth preserving where, as here, an agency is charged with regulating highly technical subject matter.[25]

---

**21.** *Wisconsin's Environmental Decade, Inc. v. Wisconsin Power and Light Co.,* 395 F.Supp. 313, 321 (W.D.Wis.1975).

**22.** *Sierra Club v. Thomas,* 828 F.2d 783, 792 (D.C.Cir.1987).

**23.** Intent to List Chloroform as a Hazardous Air Pollutant, 50 Fed.Reg. 39627 (Sept. 27, 1985).

**24.** *Id.*

**25.** The D.C. Circuit's opinion in another action filed by plaintiff, *Natural Resources Defense Council v. Thomas,* 824 F.2d 1146 (D.C.Cir.1987) (*en banc*), highlights the special danger of supplanting the Administrator's judgment in favor of the court's when deciding the dangerousness of likely carcinogenic pollutants under § 112. That case involved the degree of required regulation of vinyl chloride, a suspected carcinogen, after the EPA listed vinyl chloride as a hazardous air pollutant pursuant to § 112(b)(1)(A) of the Act. NRDC argued that because current scientific knowledge did not reveal a threshold below which vinyl chloride exposure was completely safe to humans, § 112(b)(1)(B)'s requirement that the Administrator regulate emissions so as to provide an "ample margin of safety" required that the Administrator regulate so as to prohibit all emissions. The court rejected plaintiff's argument, saying

[T]he NRDC's position would eliminate any discretion and would render the standard "ample margin of safety" meaningless as applied to carcinogenic pollutants. Whenever *any* scientific uncertainty existed about the ill effects of a non-zero level of hazardous air pollutants—and we think it unlikely that science will ever yield *absolute* certainty of safety in an area so complicated and rife with problems of measurement, modeling, long latency, and the like—the Administrator would

By the above I do not mean to imply that this court, as part of its obligation to enforce the non-discretionary duties of the Administrator, is deprived of all power to determine the progress of the Administrator's discretionary decisionmaking when that progress will necessarily determine the existence or nonexistence of an enforceable, non-discretionary duty. Certainly this court has jurisdiction to compel listing pursuant to § 112(b)(1)(A), despite Agency protests that it has not yet found the pollutants hazardous, where the Agency's objections are founded upon a patently unreasonable interpretation of the statute or where the agency's claims of tentativeness in its scientific findings are so clearly contradicted by the record that they amount to bald fabrications that are in reality analogous to the Agency's concession of dangerousness in *NRDC v. Train*, where that court compelled listing under § 108 of the Act. I do not find that such extraordinary circumstances are present in the instant action.

The contention of the Administrator and industry intervenors that § 112(b)(1)(A) only requires that the Administrator list those pollutants which may result in a "significant" increase in mortality or serious illness is not so unreasonable that it justifies this court's interference with the Administrator's discretionary power to identify hazardous air pollutants. Their argument is made at least colorable by the legislative history of the Act,[26] and by the fact that there is logical appeal to the position that Congress did not intend the Administrator to initiate costly regulatory processes for the purpose of preventing only a single death or serious illness. However, I express no view as to which party's interpretation of § 112(a)(1) is correct. I hold only that the Administrator's interpretation of that section is not so unreasonable that this district court, constrained by Congress' grant of limited jurisdiction, should depart from the well settled rule that courts should show "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See also United States v. Riverside Bayview Homes*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980). The task of defining the exact scope of the Administrator's discretion under § 112(a)(1) is necessarily left to the Court of Appeals for the District of Columbia Circuit, the court in which Congress has vested exclusive jurisdiction over the discretionary powers of the Administrator.[27]

have no discretion but would be required to prohibit all emissions. Had Congress intended that result, it could very easily have said so by writing a statute that states that no level of emissions shall be allowed as to which there is any uncertainty and the inherent limitations of scientific knowledge by vesting in the Administrator the discretion to deal with uncertainty in each case. *Id.* at 1153. Although the degree of the Administrator's discretion in defining "an ample margin of safety" may not equate with the scope of his discretion in identifying hazardous air pollutants, the D.C. Circuit's warning against unduly restricting the Administrator's judgment without a clear statutory basis seems equally applicable here.

26. Section 112 regulation extends to only that "limited number" of "extremely hazardous or toxic" substances that pose a "high risk" of serious health effects. The Environmental Policy Division of the Congressional Research Service of the Library of Congress, *A Legislative History of the Clean Air Amendments of 1970* at 289 (1972).

27. The EPA also claims that as part of his discretion whether to list he is free to consider the technical and economic feasibility of promulgating regulations. *E.g.* Memorandum in Support of Defendant's Motion to Dismiss at 10, 36. That interpretation of the statute seems inherently suspect. Section 112(b)(1)(A) requires the listing of "hazardous air pollutants," a term whose definition in § 112(a)(1) makes no reference to such non-health considerations. Furthermore, the Court of Appeals for the District of Columbia in *NRDC v. Thomas*, 824 F.2d 1146 (D.C.Cir.1987) (*en banc*), has specifically barred consideration of non-health factors in determining "an ample margin of safety" for regulations promulgated pursuant to § 112(b)(1)(B). "We hold only that the Administrator cannot consider cost and technological feasibility in determining what is 'safe.' This determination must be

In addition, a careful review of the notices convinces me that the decision to delay listing in 1985 because of inconclusive evidence of health risks was supported by sufficient evidence in the record that it would be improper for this court to ignore the judgment of the Administrator as based on obvious bad faith. In the first instance this is not a situation where, purely for an advantage in litigation, the regulatory agency seeks to repudiate an earlier position that it has firmly adhered to in the past. The notices were published well in advance of the current litigation and, with the exception of the one for acrylonitrile, clearly expressed the Administrator's current view that conclusions contained therein should not be taken as final. To that end each of the notices used, sometimes as often as six times, the words "preliminary" or "very preliminary" to describe its assessment of health and risk considerations.[28] Those claims of tentativeness are consistent with the fact that in the past the Administrator has found certain pollutants to be probable carcinogens but has nevertheless decided that the health risk posed by them did not justify their listing as hazardous air pollutants.[29]

Although all of the notices expressed grave concern about the safety of each pollutant, each notice also pointed out why that concern might be overstated and why further study was needed. For example, although each notice reported that the subject pollutant might cause cancer at some dosage level and by some means of exposure, many of the notices stressed that more information was needed to determine just how much of the pollutant actually found its way into the ambient air. The notice for chloroform is representative of the notices for ethylene oxide, 1,3–buta-

diene, cadmium and ethylene dichloride, all of which expressed the need for more information relating to the sources and quantities of pollutant emissions. The chloroform notice, for example, explained that while further study might not improve the accuracy of estimates of the carcinogenic potency of chloroform,

[t]here are other inputs to the risk estimates which are very preliminary at the current stage of assessment and which will be substantially refined through further study. The primary example of this is the source information: number and types of sources, their locations, emission rates, stack parameters, variability of emissions, etc. Current source information is based on engineering estimates, data obtained under section 114 of the [Clean Air Act], and other readily available information in the literature. This information in many cases, will be improved through plant visits and source tests. The Agency has concluded that the preliminary risk estimates presented here are sufficient to warrant further study for possible regulation. The Agency will improve these estimates, particularly with respect to emissions and exposure, before making a final decision on whether to add chloroform to the list under section 112.

50 Fed.Reg. at 39,628.

In the case of ethylene oxide, the notice reports that certain technical difficulties must be worked out before an accurate estimate of emissions and their risk to the public can be made. The notice reports that although ethylene oxide may be properly classified as probably carcinogenic, it is nevertheless the case that

based solely upon the risk to health." *Id.* at 1166. That decision would be meaningless if the EPA were allowed to take such factors into consideration when deciding whether to list. It is unclear to what extent the Administrator relied on suspect considerations of non-health factors when he issued the notices in 1985 that are the subject of this action. Even if I assumed, however, that those considerations were improper and that they played more than a *de minimis* role in the decision not to list in 1985, this court would still lack jurisdiction over the

dispute because defendant has adequately demonstrated a legitimate reason for delaying the listing decision—the preliminary nature of its health-related findings.

28. *E.g.,* Assessment of Ethylene Oxide as a Potentially Toxic Air Pollutant, 50 Fed.Reg. 40,286 (Oct. 2, 1985).

29. *See* Intervenor's Reply Memorandum at 24 (description of Agency action on hexachlorobenzene and epichlorohydrin).

ethylene oxide has not been measured in the ambient air. Reliable ambient air monitoring methodology for its measurement is not currently available. Although there are methods available to quantify exposures in the work place, the detection limit is too high for concentrations expected in the ambient air.

50 Fed.Reg. at 40,287.[30] As for hexavalent chromium, the one pollutant identified by the EPA as a known carcinogen, the notice cautions that "[f]urther study is underway to identify additional source categories and to improve these emissions estimates. There is great uncertainty in many of these estimates."[31] The record thus supports the contention of defendant and industry intervenors that in 1985 the Administrator was genuinely uncertain about the source and quantity of emissions of many of the pollutants and of their corresponding health risks.

Although the EPA is on record as affording animal studies great weight in determining carcinogenicity,[32] the EPA convincingly maintains that the absence of direct evidence of carcinogenicity in humans with certain of the pollutants is one more reason why the Administrator properly labelled his conclusions "preliminary." Tr. at 30. Under guidelines employed by the EPA to determine categories of carcinogenicity, a pollutant may properly be classified as a "probable" carcinogen where there is no conclusive epidemiological evidence that the substance causes cancer in humans, so long as the substance is known to cause cancer in animals at some dosage and by means of exposure (not necessarily inhalation).[33] In the case of 1,3–butadiene, for example, although there was sufficient evidence based on animal studies to classify that pollutant as a probable carcinogen, data on humans is reported in the notice as "inconclusive."[34] Similarly, because results from epidemiological studies of chloroform were inconclusive, that notice reported that "the available direct evidence for chloroform carcinogenicity in humans is inadequate to assess its carcinogenic potential."[35] The record thus supports what appears to be a sincere desire on the part of the Administrator to obtain more information relating to carcinogenicity in humans at the low exposure levels present in ambient air before deciding whether to list certain of the pollutants.

By discussing above EPA findings contained in the notices I do not place this court's imprimatur on the Administrator's decision that he lacks sufficient information to determine which pollutants are hazardous under § 112(a)(1). It could be that that decision, on review before an appellate court possessed of proper jurisdiction, would be found to be an abuse of the Administrator's discretion. This court, however, with its limited jurisdiction, may not second-guess decisions made in the discretion of the Administrator. My own review of the record (the above paragraphs being meant as illustrations, not specific proofs) demonstrates only that the Administrator has not exercised his judgment in such flagrant bad faith and in derogation of such incontrovertible evidence that he should be deemed, despite his denials, to have conceded the hazardousness of the subject pollutants in a manner analogous to the Administrator's explicit concession in

30. Although the EPA did employ computer models to estimate concentrations of ethylene oxide in the air, as with chloroform it decided that risk estimates based on those computer projections should be improved before making a final decision whether to list ethylene oxide. 50 Fed. Reg. at 40,288.

31. 50 Fed.Reg. at 24,317.

32. The EPA's "Proposed Guidelines for Carcinogen Risk Assessment," 50 Fed.Reg. 46,294 (Nov. 23, 1984), identified five categories for overall evidence of carcinogenicity: "Human Carcinogen"; "Probable Human Carcinogen"; "Possible Human Carcinogen"; "Not Classified"; and "No Evidence of Carcinogenicity for Humans." According to the guidelines describing probable human carcinogens: "In the absence of adequate data in humans, it is reasonable, for practical purposes, to regard agents for which there is a sufficient evidence of carcinogenicity in animals as if they presented carcinogenic risk to humans." *Id.* at 46,300 col. 2.

33. *Id.*

34. 50 Fed.Reg. at 41,466 col. 3.

35. 50 Fed.Reg. at 39,627 col. 2.

*NRDC v. Train, supra.* Because the Administrator has not yet reached such a conclusion, no mandatory duties exist for this court to enforce pursuant to § 304(a)(2) of the Clean Air Act.

*Acrylonitrile*

As in the case of the other seven pollutants, the EPA has a enforceable non-discretionary duty to list acrylonitrile only if it has first found that substance to be a hazardous air pollutant pursuant to § 112(a)(1) of the Clean Air Act. Although the notice issued with regard to acrylonitrile in June 1985 classified that pollutant as a probable carcinogen, I have already rejected the rule sought by plaintiff that such a finding equates *per se* with a determination by the Administrator that the pollutant is a hazardous air pollutant.

The analysis employed above is not strictly applicable to acrylonitrile, however, for unlike the notices published with respect of the other pollutants, the notice relating to acrylonitrile does not explicitly claim to be "preliminary," as is consistently the case with the other pollutants. Instead of saying that the Administrator will decide whether to list only after further improving his assessment of public health risks, the acrylonitrile notice merely announced the EPA's plan to help local authorities study the health implications of acrylonitrile and to develop local regulations if necessary. The EPA's decision to launch a pilot program with the states may well constitute a "nationally applicable regulation" or "final action" that is only reviewable by the Court of Appeals for the District of Columbia. 42 U.S.C. § 7607(b)(1); *Center for Auto Safety v. EPA*, 558 F.Supp. 103 (D.D.C.1983); *Environmental Defense Fund, Inc. v. Costle*, 448 F.Supp. 89, 92 (D.D.C.1978), *aff'd sub nom., Citizens to Save Spencer County v. EPA*, 600 F.2d 844 (D.C.Cir.1979). I need not decide that issue, however, for it is apparent that in any case the EPA has not yet found acryl-

onitrile to be a hazardous air pollutant so as to give rise to a non-discretionary duty enforceable under § 304(a)(2).

■ The acrylonitrile notice clearly indicated that the EPA's evaluation of the hazardousness of acrylonitrile was not then complete, except in the sense that further evaluation was suspended in favor of the pilot program. For example, the notice advises that "[i]f a State chooses not to accept the responsibility of evaluating [acrylonitrile] sources or if the affected agency fails to fulfill their commitments, EPA will complete the evaluation and determine the need for regulation under the Clean Air Act or other appropriate Federal authority." [36] The notice continues saying "[w]here control is determined to be necessary, appropriate regulations will be developed." [37] Clearly the Administrator did not exercise his discretion so as to judge acrylonitrile, which he found to be one of the least dangerous of the pollutants, a hazardous air pollutant, any more than he did so with respect to the other seven pollutants. So long as he has not made that affirmative determination there is no non-discretionary duty to list that this Court can enforce.

*Alternative Bases for Jurisdiction*

In addition to § 304 of the Clean Air Act, NRDC alleges as bases for subject matter jurisdiction 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (interstate commerce) and 28 U.S.C. § 1361 (the Mandamus Act).[38] None of these statutory provisions vests this court with jurisdiction over NRDC's claim.

■ The Mandamus Act only provides an additional remedy where jurisdiction already exists and does not confer an independent basis of jurisdiction. *Smith v. Lehman*, 533 F.Supp. 1015, 1018 (E.D.N.Y.), *aff'd*, 689 F.2d 342 (2d Cir.1982), *cert.*

---

**36.** 50 Fed.Reg. at 24,321 col. 1.

**37.** *Id.* at col. 2.

**38.** Plaintiff's complaint asserts that its claims are also reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Complaint at ¶ 2. However, plaintiff does not rely on either of these statutes to confer an independent basis of jurisdiction. Plaintiff's Reply Memorandum at 20 n. 28.

*denied,* 459 U.S. 1173, 103 S.Ct. 820, 74 L.Ed.2d 1018 (1983). Furthermore, it is well settled that a writ of mandamus can only compel an official to perform a ministerial duty and not a discretionary act. Because this court has already found that the Administrator's decision whether to list the subject pollutants turns on his discretionary power to identify hazardous air pollutants, the Mandamus Act does not afford the NRDC a basis for jurisdiction in the district court.

■ District courts possess no federal question jurisdiction under 28 U.S.C. § 1331, nor jurisdiction over actions arising under an act of Congress regulating commerce via 28 U.S.C. § 1337, where Congress has provided for exclusive review in the appellate courts. *See Telecommunications Research & Action Center v. F.C.C.,* 750 F.2d 70, 77 (D.C.Cir.1984) (hereinafter *"TRAC"*) ("a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute"); *Sun Enterprises, Ltd. v. Train,* 532 F.2d 280 (2d Cir.1976). The Clean Air Act contains comprehensive jurisdictional provisions assigning review of final actions of the Administrator to the appellate courts, and review of allegations that the Administrator has failed to perform a non-discretionary duty to the district courts. 42 U.S.C. §§ 7607, 7604. There could be no doubt as to the inapplicability of either 28 U.S.C. § 1331 or 28 U.S.C. § 1337 if this case involved a final decision of the Administrator reviewable only in the appropriate appellate court. *See Dow Chemical Co. v. Costle,* 480 F.Supp. 315, 320 (E.D.Mich.1978), *aff'd,* 659 F.2d 724 (6th Cir.1981).

Plaintiff correctly points out, however, that while § 307(b) of the Act vests exclusive jurisdiction over final Agency action in the appellate courts, it does not speak to non-final Agency action. From that fact plaintiff argues that even if the absence of a non-discretionary duty deprives this court of jurisdiction under § 304, there is still jurisdiction under 28 U.S.C. §§ 1331 and 1337 to review non-final, discretionary actions of the EPA on grounds that the EPA has "unreasonably delayed" listing the pollutants. 5 U.S.C. § 706(1) (APA provision allowing courts to compel action "unreasonably delayed"). Plaintiff's Reply Memorandum at 20 n. 28.

The complaint does not allege the "unreasonable delay" theory advanced by plaintiff in its motion papers. However, defendant and the industry intervenors have not objected to plaintiff's arguments on those grounds; and plaintiff's argument is of obvious substance. Given modern day liberality of pleading, I will deem plaintiff's complaint to be amended accordingly, and consider plaintiff's unreasonable delay theory.

It is a question of substance because of the leaden pace of EPA's progress in this area. Indeed, as noted *supra* at 248, in 1983 a congressional oversight subcommittee took then EPA Administrator Ruckelshaus to task for delays in implementing Section 112. The subcommittee received from Mr. Ruckelshaus assurances which the Agency has not redeemed. In reviewing the chronology, replete with endless reviews, open-ended studies, proclaimed needs for further analyses, consultations and testings, but with minimal results, one is reminded of Gilbert's lyric in *Iolanthe,* Act 2:

> "The House of Peers,
>   throughout the war,
> Did nothing in particular,
>   And did it very well."

The reasonable perception that EPA is doing "nothing in particular" in respect of carcinogenic substances carried in the air we all breathe does nothing to diminish a sense of frustration. However, there is no alchemy by which a district judge can transform a sense of frustration into subject matter jurisdiction. The fact is that in *TRAC,* the Court of Appeals for the District of Columbia Circuit implicitly rejected the argument now put forward by plaintiff, in the context of an analogous statutory scheme vesting in the appellate courts review of final Federal Communications Orders. *TRAC* holds that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief

that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals." 750 F.2d at 75 (emphasis in original). The *TRAC* court specifically found that because claims of unreasonable delay impacted on its future jurisdiction over final decisions of the FCC, it had exclusive jurisdiction over such claims. *Id.* at 77. The court noted that exclusive jurisdiction allowed appellate courts to develop an expertise concerning the agencies assigned to them for review, and that such expertise promoted judicial economy and greater fairness for the litigants by eliminating the delay and expense that accompany duplicative and potentially conflicting review. *Id.* at 78.

In *Sierra Club v. Thomas*, 828 F.2d 783 (D.C.Cir.1987), the District of Columbia Circuit specifically applied its holding in *TRAC* to the Clean Air Act, with its bifurcated system of district and appellate court review. The court of appeals in *Sierra* considered at length its prior holdings in *TRAC* and *NRDC v. Train*, 510 F.2d 692 (D.C.Cir.1975). That *Train* decision construed comparable provisions in the Federal Water Pollution Control Act Amendments of 1972, a statute which was explicitly modeled on the Clean Air Amendments of 1970. *Sierra* at 828 F.2d 787 n. 34.

In its discussion of district court jurisdiction, the *Sierra* court at 787–792 concluded that where the governing statute contains a specific deadline, which serves as the source of a "nondiscretionary duty of timeliness," the district court has jurisdiction "to compel performance of a statutory duty that has been unreasonably delayed." *Sierra* at 788, quoting *Train* at 510 F.2d 704.

However, *Sierra* follows *TRAC* in concluding that a district court cannot "enforce as nondiscretionary a duty of timeliness imposed by a deadline that is not readily-ascertainable but instead exists only as the product of a set of inferences based upon the overall statutory scheme." That is the way the question is posed in *Sierra* at 791 (footnote omitted); the question is answered in the negative at 791–92:

> ... When no deadline can be readily ascertainable from the statute, but is mere-

ly inferred from the overall statutory scheme, a claim alleging unreasonable delay under the Clean Air Act should come to this court under section 307 of the Act and the jurisdictional rule announced in *TRAC.*

The Ninth Circuit, in *Public Utility Commissioner of Oregon v. Bonneville Power Administration*, 767 F.2d 622, 626–27 (9th Cir.1985) (Kennedy, J.), specifically adopted the reasoning of *TRAC* in rejecting claims that 28 U.S.C. § 1331 provided an independent basis of jurisdiction for district courts over ongoing agency proceedings where the Pacific Northwest Electric Power Planning and Conservation Act vested judicial review of final agency action in the Court of Appeals.

■ Accordingly, while EPA's delays in addressing an issue which is literally one of life and breath remain troubling to this court, I conclude that the statutory scheme vests exclusive jurisdiction over interim claims of unreasonable delay in the court of Appeals for the District of Columbia Circuit. To use statutory shorthand, plaintiff may well have a § 307 claim, but it does not have a § 304(a)(2) claim.

## CONCLUSION

Defendants and the industry intervenors' motions to dismiss this action for lack of subject matter jurisdiction are granted. The Clerk of the Court is directed to dismiss the action without prejudice and without costs.

The foregoing is SO ORDERED.