PHYSICIANS COMMITTEE FOR RE-
SPONSIBLE MEDICINE, People for
the Ethical Treatment of Animals,
American Anti–Vivisection Society,
Alternatives Research & Development
Foundation, Rosa Naparstek, Scott
Mishler and John Gentry, Plaintiffs–
Appellants,

v.

Stephen L. JOHNSON,* Administrator
of the United States Environmental
Protection Agency, Defendant–Appel-
lee.

Docket No. 04–5564–CV.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 14, 2005.

Decided: Feb. 1, 2006.

* United States Environmental Protection Agen-
cy Administrator Stephen L. Johnson is auto-
matically substituted for former Administra-
tors Michael O. Leavitt and Marianne Lamont
Horinko pursuant to Federal Rule of Appel-
late Procedure 43(c)(2).

Sean H. Lane, Assistant United States Attorney, New York, New York (Michael J. Garcia, United States Attorney for the Southern District of New York, Lisa R. Zornberg, Assistant United States Attorney, of counsel), for Defendant–Appellee.

Before: MINER, KATZMANN, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

Appellants, Physicians Committee for Responsible Medicine, *et al.*, appeal from a judgment of the United States District Court for the Southern District of New York (Swain, J.) granting appellee's motion for summary judgment and denying appellants' cross-motion for summary judgment. Appellants sued the Administrator of the United States Environmental Protection Agency (the "Agency") under the citizen suit provision of the Toxic Substances Control Act, 15 U.S.C. §§ 2601–2629 ("TSCA"), which gives any person the right to compel the Agency to perform any duty that is nondiscretionary under TSCA. *See id.* § 2619(a)(2). Appellants seek (1) to compel the Agency to issue a rule establishing a mandatory testing program for high production volume ("HPV") chemicals[1] and (2) to terminate the Agency's current voluntary testing program.

## I

### A

Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical substances and mixtures.[2] *See*

Daniel Kinburn, Physicians Committee for Responsible Medicine, Washington, D.C., for Plaintiffs–Appellants.

---

**1.** The Agency defines "HPV chemicals" as chemicals that "[t]he U.S. produces or imports ... (excluding polymers and inorganic chemicals) at over 1 million pounds per year." EPA OFFICE OF POLLUTION PREVENTION AND TOXICS, CHEMICAL HAZARD DATA AVAILABILITY STUDY, at 2 (April 1998), *available at* http://www.epa.gov/chemrtk/hazchem.pdf.

**2.** Hereafter, "chemical substances and mixtures" will be referred to simply as "chemicals."

15 U.S.C. § 2601. Shortly after TSCA was enacted, the Office of Pollution Prevention and Toxics ("OPPT") was created and charged with implementation of TSCA. In general, OPPT tracks more than 80,000 chemicals that have been available for sale or use in the United States since 1979. *See* EPA OFFICE OF POLLUTION PREVENTION AND TOXICS, OVERVIEW: OFFICE OF POLLUTION PREVENTION AND TOXICS PROGRAMS, at 2 (December 2003) ("OPPT PROGRAM OVERVIEW"), *available at* http://www.epa.gov/oppt/oppt101c2.pdf. Pursuant to TSCA's mandate, OPPT has established programs for gathering information on and identifying risks of new and existing chemicals in or entering the United States. *Id.* at 2–3. In addition to risk control regulations that may be promulgated under TSCA, *see* 15 U.S.C. § 2605, the Act's "information collection/dissemination actions [also] serve to facilitate implementation of media-specific statutes, like the Clean Air Act." OPPT PROGRAM OVERVIEW, at 3. HPV chemicals, which are the focus of this appeal, comprise one particular subgroup of the chemicals under the watch of OPPT.

Section 2603(a)(1)(B) requires the Administrator to initiate a rulemaking if the Administrator finds that there is or will be substantial production of a chemical, and that either the chemical may be subject to substantial release into the environment or there is or may be significant exposure of the chemical to human beings. These findings—referred to as "B Findings", a term of art used in reference to section 2603(a)(1)(B)—must accompany an additional finding that there is insufficient data and experience to determine or predict the effects of the chemical on humans or the environment and that testing is necessary to develop such data. *See id.* at § 2603(a)(1)(B)(ii) & (iii). Under TSCA, once the Agency makes these findings, the Administrator has a nondiscretionary duty to propose a rule for testing of the chemical. *Id.* at § 2603(a) (flush language).

In the usual case, the mandatory rulemaking duty will be triggered by formal Agency findings. In 1993, the Agency promulgated a policy for evaluating whether or not a chemical, HPV or otherwise, satisfies the requirements for B Findings. *See* Criteria for Evaluating Substantial Production, Substantial Release, and Substantial or Significant Human Exposure, 58 Fed Reg. 28,736 (May 14, 1993) (final statement of policy). That policy sets guidelines for evaluating what level of release or exposure is "substantial." *Id.* at 28,746. The Agency claims that the policy also has a procedural component that it committed to follow when making findings. To date, the Agency has never made a rule regarding HPV chemicals because, as the Agency contends, it has never made the requisite B Findings.

■ However, the Agency may be required to propose a test rule regarding certain chemicals for which, although the agency has made no formal findings, it has made the "functional equivalent" of formal findings. *See Physicians Comm. for Responsible Med. v. Leavitt*, 331 F.Supp.2d 204, 207 (S.D.N.Y.2004) (*"Leavitt"*) (quoting *Natural Res. Def. Council, Inc. v. Thomas*, 689 F.Supp. 246, 254 (S.D.N.Y. 1988) (*"Thomas"*), aff'd, 885 F.2d 1067 (2d Cir.1989)); *Natural Res. Def. Council, Inc. v. EPA*, 595 F.Supp. 1255, 1260–61 (S.D.N.Y.1984) (*"NRDC"*). When the Agency has made *"de facto findings"* on certain chemicals, it would subvert the statutory scheme to allow the agency to excuse itself from the statute's rulemaking mandate through its failure to make formal findings. *See NRDC*, 595 F.Supp. at 1260–61.

**B**

In 1997, the Environmental Defense Fund ("EDF") published a report, "Toxic

Ignorance," which brought various health and environmental risks from HPV chemicals to national attention. In addition, EDF began a nationwide advertising campaign, calling on the chemical industry and the federal government to increase testing of HPV chemicals. In response to this pressure, on April 21, 1998, then-Vice President Gore announced the "Chemical Right–to–Know Initiative" ("ChemRTK"), which included the "HPV Challenge Program." Under that program, which was developed to increase toxicity data for HPV chemicals, chemical companies were exhorted to "sponsor" chemicals by submitting to the Agency new or existing data on a variety of toxicity factors. The Agency also indicated that unsponsored chemicals may be subject to test rules promulgated under TSCA.[3] *See* Data Collection and Development on High Production Volume (HPV) Chemicals, 65 Fed.Reg. 81,686 (Dec. 26, 2000) (notice).

Participation in the HPV Challenge Program requires sponsors to submit "robust summaries" of current toxicity data for chemicals that they produce or import, as well as a plan to demonstrate where further testing is needed to fill in the data gaps. *Id.* at 81,688, 81,694. The Agency then scrutinizes the reports and responds by either recommending further testing or approving or not otherwise objecting to the submitted testing programs. The Agency's review of the robust summaries and its responses to the submissions form the basis of appellants' claim that the

Agency has completed the necessary review to make B Findings.

Appellants also point to certain public statements related to the HPV Challenge Program as clear evidence of *de facto* B Findings. In particular, they point to the notice published in the Federal Register, *see* Appellants Br. 35, as well as testimony and letter submissions by Agency representatives to a House of Representatives Subcommittee, *see* Appellants Br. 36–39. They argue that these statements show that the Agency has gathered and analyzed sufficient data to make B Findings for HPV chemicals.

## C

Appellants commenced this action in the Southern District of New York on September 5, 2002, seeking to compel the Agency to propose a rule for the testing of HPV chemicals and to prevent the Agency from conducting the HPV Challenge Program. On October 8, 2003, the district court granted partial summary judgment in favor of the Agency, finding that TSCA's citizen suit provision did not permit a determination of whether the HPV Challenge Program is *ultra vires* and that the Agency's administration of the program does not violate the Federal Advisory Committee Act. *See Physicians Comm. for Responsible Med. v. Horinko*, 285 F.Supp.2d 430, 442–43, 447 (S.D.N.Y.2003). The district court explicitly reserved judgment on the issue of whether or not the Agency had

---

**3.** Appellants represent the HPV Challenge Program as a mock-voluntary system. They say that the companies are presented with a Hobson's choice: either voluntarily submit to testing or endure legally mandated testing. Appellants argue that the companies are, of course, going to voluntarily sign up and that this compels the conclusion that the Agency's purpose in running the voluntary program is to circumvent the regulatory mandate of TSCA. But we do not see how the Agency's

encouragement of voluntary submission to testing compels that conclusion. A voluntary system may be a more efficient alternative means of regulating the chemical industry. Companies may voluntarily submit to testing because of public pressure and not because of an alleged regulatory threat. Furthermore, appellants do not claim that a mandatory system would be more effective than the voluntary system.

made *de facto* B Findings and could be compelled to initiate a rulemaking. *See id.* at 441. Following further discovery, the parties renewed their motions for summary judgment. For the purposes of the renewed motion, the Agency conceded findings of "substantial production" and "data insufficiency and necessity of testing." *See Leavitt,* 331 F.Supp.2d at 205. Thus, the only issue before the district court was whether the Agency made findings as to either "substantial release" or "substantial exposure." *Id.*

The district court granted summary judgment in favor of the Agency on August 20, 2004. In denying appellants' claim of *de facto* B Findings, the district court found that appellants' argument was defeated by its own logic. *See id.* at 207. The court noted that while appellants' claim of *de facto* Agency findings was based on broad public statements about HPV chemicals in general, appellants had admitted in their submissions to the court that those statements were not applicable to a subgroup of HPV chemicals called "closed system intermediates" ("CSIs").[4] Thus, the district court found that, because those statements did not apply to *all* HPV chemicals, they could not constitute *de facto* findings. *Id.*

The district court also noted that, while the "absence of formal findings is not determinative of a claim of *de facto* findings," the procedure the Agency employs in making findings is relevant in determining whether the Agency merely skipped formalizing the findings it has already made. *See id.* The court found that appellants offered no evidence to prove that the general statements made by the Agency "were

the product of an analysis that in any way approximates, or can be substituted for, the type of analysis that would be required for a formal finding of substantial release and/or substantial exposure." *Id.* 207.

The district court primarily relied on *Thomas. Thomas* was brought under a similar citizen suit provision of the Clean Air Act, which provides that the Administrator may be compelled to establish emissions standards for any substance that has been added to the Agency's list of "hazardous air pollutants." *See Thomas,* 689 F.Supp. at 248. The court in *Thomas* rejected a contention, similar to appellants' argument here, that certain statements published in the Federal Register were the functional equivalent of an Agency finding that the chemicals in question should be included on the pollutant list. *See id.* at 255. In dismissing that argument, the court found that the Agency's decision not to list the chemicals fell within the range of discretion conferred by the statute. *See id.* at 258–59.

The district court in this case also noted that under TSCA's citizen suit provision the court only has jurisdiction to compel the Agency to perform certain nondiscretionary functions. *See Leavitt,* 331 F.Supp.2d at 208. Without the Agency having made the requisite findings, the court could not compel a rulemaking. In addition, the court found that it had no authority to enjoin the Agency from running the HPV Challenge Program, as that program is discretionary.[5]

Appellants raise two issues on appeal. First, they claim that the district court erred in finding that the Agency had not

---

4. "Closed system intermediates" are chemicals that are "specifically insulated from release into the environment." *See Leavitt,* 331 F.Supp.2d at 207.

5. The district court declined to address appellants' argument (apparently raised on supplemental briefing) that section 2619(a)(1) permits a court to enjoin the HPV Challenge Program. *Id.* at 208 n. 4.

made *de facto* findings as to "substantial release" and/or "substantial exposure." Second, they argue that the district court erred in its holding that it lacked authority to issue injunctions both compelling the Agency to initiate a rulemaking and prohibiting the Agency from conducting the HPV Challenge Program.

## II

### A

■ This court reviews the grant of summary judgment *de novo,* affirming only if the movant demonstrated that there was no genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005); FED. R. CIV. P. 56(c). While we must ensure that the district court correctly applied the substantive law, *see Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542 (2d Cir.1993), where TSCA is silent or ambiguous as to a legal standard, we must also give deference to the Agency's interpretation of its Congressional mandate. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Chem. Mfrs. Ass'n v. EPA,* 859 F.2d 977, 984 (D.C.Cir.1988).

### B

■ On appeal, appellants argue that the district court incorrectly found that the Agency's activities in connection with the HPV Challenge Program, along with certain public statements, do not amount to *de facto* findings. Their main argument rehashes their position before the district court, *i.e.,* public statements made by the Agency and Agency officials show that various officials within the Agency regard HPV chemicals as posing a health and environmental threat because of the possibility of substantial release or exposure.[6] We find, however, that these statements fall far short of constituting *de facto* findings. Appellants do not point to a connection between the statements and any specific supporting data in the Agency's possession. We are reluctant to hold that the Agency has made critical, science-based conclusions where there is no obvious connection between the proffered statements and hard data before the Agency. Furthermore, the statements themselves do not reflect the Administrator's view that the potential for exposure or release rises to the level of substantiality necessary to trigger the TSCA rulemaking duty. While appellants claim that the statements are evidence of potential for release and exposure, they cannot prove that the substantiality of that risk rises to the level that would be necessary for the Agency to make B Findings.[7]

6. Appellants argue in their reply brief that a report published by the Agency, which discusses HPV chemicals in relation to worker safety data gathered in the National Occupational Exposure Survey, shows that the Agency has made the finding of "substantial exposure" that is necessary to trigger the mandatory rulemaking duty. *See* Reply Br. 2–5. While we find this argument more compelling than those raised by appellants in the district court and in their main brief, we need not decide whether the report operates as *de facto* findings because "[a]rguments raised for the first time in an appellate reply

brief are not properly before the court." *D'Alessio v. SEC,* 380 F.3d 112, 120 n. 11 (2d Cir.2004) (quoting *United States v. Hernandez–Fundora,* 58 F.3d 802, 810 n. 3 (2d Cir.1995)). Thus, the pending motion to supplement the record with this document is moot.

7. Appellants argue that the district court incorrectly disregarded the public statements because they do not pertain to CSIs. They argue that there is evidence that CSIs pose *some* risk of exposure, and thus, might be covered by the general statements. As a

■ Appellants offer a novel, but unconvincing, alternate argument. They contend that, because "only CSIs qualify for reduced testing based upon the presumption of reduced exposure," the Agency, *"ipso facto,* found that all non-CSIs would be subject to substantial release and exposure." The latter, however, does not follow from the former: While CSIs may be subject to insubstantial risk of release or exposure, the risk of release or exposure for the non-CSI HPV chemicals does not necessarily rise to the level of substantiality required to compel a rulemaking.[8]

Appellants also attempt to distinguish *Thomas.* They contend that, while the Agency in *Thomas* had expressly declined to add a chemical to the pollutant list because the Agency did not want to set emissions standards, in the present case the Agency did not rule out the findings but, instead, merely gathered the necessary test data without formalizing the findings. Appellants never really say why this distinction should win the day, but instead, merely offer a (supposedly) rhetorical question: "[Q]uery, why [would the] EPA ... devote valuable Agency time and resources, and why [would] chemical companies ... squander substantial sums to test chemicals which TSCA did not require to be tested?" Appellants Br. 41–42. We can think of several reasons why the Agency would choose to run such a program and why the companies would choose to participate—*e.g.,* public opinion, political pressure, a sincere desire to protect public health, potential tort liability—but speculation is not the task at hand. It is enough to note that appellants fail to distinguish *Thomas* in any meaningful way.

In response to these arguments, the Agency asserts that the undisputed evidence in the record shows that the Agency did not make the factual findings—*de facto* or otherwise—necessary to trigger its nondiscretionary rulemaking duty. First, the record shows that the officials with authority for making such determinations regarding substantial release and substantial exposure have not made them for all HPV chemicals. Second, the Agency points out that it has not gone through its regular analytical process for gathering and assessing data to make the necessary determinations for all HPV chemicals.[9] Third, the Agency lacks the data to make a determination whether all HPV chemicals satisfy substantial exposure and release criteria. Fourth, there is neither evidence that the Agency has used its own procedures for making the B Findings nor that it wishes to abandon those procedures.

In the Agency's view, the district court correctly refused to construe general statements made by the Agency as *de facto* findings because those statements were not scientific or accurate as to all such chemicals.[10] The Agency also notes

threshold matter, it is unclear whether or not appellants raised this argument before the district court, and thus, it is unclear whether it is properly before us. Nevertheless, even if the statements did apply to all HPV chemicals, we find that they would not constitute *de facto* findings.

8. We also note the somewhat disingenuous nature of this argument, given appellants' attempt to convince this Court that the Agency's statements about risk of release and exposure may apply to CSIs. *See supra* note 7.

9. The Agency contends that this process is crucial to its findings—both scientifically and from a policy perspective.

10. The Agency also points out that the appellants have not proved that HPV chemicals are a "category" under section 2625(c)(2)(A). The Agency argues that it has made no findings as to any subset of HPV chemicals for which they have recommended or accepted testing because the "robust summaries" have not been subjected to the same kind of scrutiny and analysis that would ordinarily go into making findings.

that appellants' claim contravenes the holding of *Chem. Mfrs. Assoc. v. EPA,* 899 F.2d 344 (5th Cir.1990) ("*CMA* "). *CMA* held that "substantiality" must be based on specific, articulable findings, not simply generalized findings about categories of chemicals.[11] *Id.* at 357. Finally, the Agency points out that findings made under section 2603(a)(1)(A), called "A Findings," must be supported by specific findings based on strong evidence. *See Chem. Mfrs. Ass'n,* 859 F.2d at 985–86. The Agency contends that "rulemaking based on ... general statements is flatly inconsistent with Congress' intent that judicial review of test rules promulgated by [the Agency] under Section 4 be more searching than the judicial review undertaken in most administrative rulemaking cases." Appellee Br. 41 (citing 15 U.S.C. § 2618(a)(1)(B)).

While the decision in *NRDC* illustrates the authority of the courts to recognize *de facto* B Findings, the district court below was correct in declining to do so on this record. In our view, this area of the law requires careful attention to the facts and statutory framework in play in each case. In *NRDC,* certain chemicals had been recommended for further study by the Interagency Testing Committee ("ITC"), which is "directed to select and recommend to [the Agency] a list of those chemicals whose potential risks to health and the environment ... [require] 'priority consideration by the agency for the promulgation of a rule.'" *NRDC,* 595 F.Supp. at 1258 (quoting 15 U.S.C. § 2603(e)(1)(A)). Under TSCA, the ITC must consider a number of specific factors, including the production level, release potential, and health risks associated with a chemical. *See* 15 U.S.C. § 2603(e)(1)(A)(i)-(viii). That is,

the ITC is specifically charged with analyzing data about chemicals covered under the TSCA and deciding whether or not certain risks associated with the chemical warrant regulation by the Agency. Thus, in *NRDC,* the recommendation by the ITC presumptively satisfied the substantive requirements for findings, and the recommendation was a reasonable proxy by which the court could assess the existence of the "functional equivalent" of formal findings. Moreover, the EPA had a statutory obligation, within a certain period of time, to either formally adopt such recommendations by beginning a rulemaking or formally reject them in the Federal Register. It did neither, instead entering into "voluntary" testing arrangements with the companies involved. *Id.* at 1258–59. On these facts, the agency's actions indicated that it had made the functional equivalent of formal findings.

By contrast, in the case before us, nothing obligates the agency to make findings one way or the other with respect to the chemicals at issue. Nor has the agency taken any specific action that suggests it has made the necessary findings but has not formalized them. Instead, plaintiffs' case looks much like that of the plaintiffs in *Thomas,* who argued that notices published in the Federal Register showed that the Administrator had determined that certain substances were "hazardous," thus triggering the Agency's duty under the Clean Air Act (similar to the one allegedly triggered in this case) to set emissions standards for those potential pollutants. *See Thomas,* 689 F.Supp. at 254. *Thomas* rejected that contention, finding that, while the notices may have indicated that the Agency considered the substances "hazardous" in the ordinary sense of the

---

**11.** The Agency claims that it was in response to this decision that it developed its protocol for making findings in 1993.

word, there was no evidence that the Agency had made the specific findings it believed necessary to satisfy the statute's definition of "hazardous." *Id.* To the extent that plaintiffs argued that the Agency *should* have made such formal findings based on the evidence before it and the plaintiffs' differing interpretation of the statute, *Thomas* continued, their claim should be brought under the Administrative Procedure Act rather than this citizen-suit provision. *Id.* at 255–56.

In our view, the district court acted appropriately in requiring the plaintiff to come forward with evidence from which it can be inferred that the Agency has actually made the discretionary findings that trigger its rulemaking duty, rather than simply evidence that the Agency has some inclination to do so or that not doing so was an abuse of the Agency's discretion. Although we agree with appellants that the Agency should not be allowed to subvert the mandate of TSCA by mere bureaucratic finagling, we see no evidence that the Agency has attempted to do so here. In reaching this conclusion, we emphasize the exceedingly narrow scope of our review under the citizen-suit provision.

## C

Appellants also ask this Court to decide what relief is available under TSCA. They contend that they are entitled under section 2619(a)(2) to injunctive relief compelling the Agency to initiate a rulemaking. They further argue that under section 2619(a)(1) they are entitled to a declaratory judgment that the HPV Challenge Program violates TSCA and to an injunction barring the further conduct of the program.[12]

Section 2619(a)(2) allows any aggrieved person to sue the Agency to compel the performance of any duty that is nondiscretionary under TSCA. Appellants essentially reiterate their argument that the EPA made *de facto* findings, and thus, the court has jurisdiction under section 2619(a)(2) to compel the EPA to conduct a rulemaking to formulate HPV testing rules. The district court declined to exercise such jurisdiction because it found that the Agency had not made the requisite findings. We affirm the district court's decision on this issue for substantially the same reasons.

■ Appellants fail in their second contention as well. Section 2619(a)(1) permits suit against a "person" who violates TSCA or the rules promulgated under TSCA. That is, whereas subsection (a)(2) permits citizen suits against the Agency in its capacity as a regulator, subsection (a)(1) permits citizen suits against regulated parties, including governmental entities to the extent they are subject to TSCA. Subsection (a)(1) does not provide an alternative avenue for challenging the Agency's actions as a regulator, as plaintiffs suggest. Such an interpretation is unreasonable, as it would

12. Section 2619, which governs civil suits under TSCA reads:

(a) In general

Except as provided in subsection (b) of this section, any person may commence a civil action -

(1) against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV of this chapter, or order issued under section 2604 of this title or subchapter II or IV of this chapter to restrain such violation, or

(2) against the Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary.

15 U.S.C. § 2619(a)(1), (2).

both render the narrower subsection (a)(2) completely superfluous and nullify subsection (a)(2)'s limitation to suits compelling the Agency to perform a non-discretionary duty. *Cf. Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Accordingly, we decline to exercise jurisdiction under subsection (a)(1).

## III

We hold that the district court was correct in finding that the Agency had not made *de facto* findings, and consequently, that the court did not have jurisdiction to either compel the Agency to propose a testing rule or to enjoin the HPV Challenge Program. Accordingly, the district court's judgment of August 23, 2004, in favor of defendant-appellee is hereby AF-FIRMED.